IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LHRET READING, L.P., <br><br> Plaintiff, <br><br> v. <br><br> KEYSTONE ONCOLOGY ASSOCIATES, P.C.; <br> PATRICK J. COLARUSSO, D.O.; and <br> LEISAWITZ HELLER ABRAMOWITCH <br> PHILLIPS, P.C., doing business as <br> THE LAW FIRM OF LEISAWITZ HELLER, <br><br> Defendants. | CIVIL ACTION <br> NO. 14-6169 |

**MEMORANDUM**

**SCHMEHL, J. /s/ JLS**                                                                                June 22, 2015

      In this suit for breach of a lease for commercial office space, Plaintiff landlord has sued not only the tenant medical practice and its controlling individual, but also the tenant's law firm. Beyond the breach of contract, Plaintiff alleges the individual also breached a fiduciary duty by wrongly disposing of the practice's assets without paying the lease obligation. The law firm, in Plaintiff's view, aided and abetted that breach of fiduciary duty. The Court agreed to consider the claim against the law firm separately before the other defendants respond to the complaint and, as discussed below, will grant dismissal of that claim.

Factual Allegations

      Defendant Patrick J. Colarusso, D.O., is a doctor who practiced through Defendant Keystone Oncology Associates, P.C., of which he was also an officer and the controlling shareholder. The practice operated out of office space leased from Plaintiff

LHRET Reading, L.P. Following an extension in 2012, the lease term was to expire in February of 2017. In summer 2013, Colarusso had to close the Keystone practice after its financial viability failed (due in part, according to Defendants, to Plaintiff's actions). He informed Plaintiff of the practice's closing in a letter that also expressed interest in assigning or subleasing the leased space. Defendants have indicated they did in fact eventually arrange a replacement tenant.

Plaintiff quickly responded with a letter explaining that Keystone remained obligated under the lease and that vacating the space before February 2017 would be an event of default. Shortly thereafter, Colarusso did end the Keystone practice and sold all its assets to the Reading Hospital; Defendant law firm Leisawitz Heller represented Keystone and Colarusso in that deal. A few months later, Plaintiff sent Colarusso a letter indicating he was in default of the lease and demanding the remaining amount due, $785,877.67. Another month passed, and Defendant law firm responded on behalf of Keystone and Colarusso with another letter, stating that after paying other debts, Keystone had only $46,000 remaining, of which $36,000 was offered to settle Plaintiff's claims under the lease. Finally, in a January 2014 letter, Defendant law firm described to Plaintiff how the proceeds of sale of the practice were distributed; of the $856,062 total, most went to pay a chemotherapy drug supplier, with other payments for a line of credit, a pension plan, and payroll. The letter also noted a $312,000 distribution to Colarusso "for cost of leasehold improvements and drug inventory." Only the previously mentioned $46,000 remained.

According to Plaintiff, this distribution, particularly the payment Colarusso made to himself, wrongly disposed of assets that should have been used first to pay the amounts

due under the lease. Plaintiff alleges that Defendant law firm's involvement includes sending the letters noted above, negotiating the asset sale, facilitating the distribution of the sale proceeds, and generally representing Keystone and Colarusso in these matters. Based on the content of the letters back and forth, Plaintiff also alleges the law firm knew Keystone owed a lease debt to Plaintiff and that Keystone was insolvent.

Procedural History

Plaintiff filed its complaint on October 28, 2014, listing the following claims: breach of contract against Keystone, breach of fiduciary duty against Colarusso, fraudulent transfer against Keystone and Colarusso, aiding and abetting breach of fiduciary duty against the law firm, and piercing the corporate veil against Colarusso.

Keystone and Colarusso moved for permission to delay responding to the complaint until after resolution of the law firm's imminent motion to dismiss the claim against it. The Court granted that extension. The law firm filed its motion to dismiss, and the Court scheduled oral argument. Plaintiff filed an amended complaint, the law firm filed a new motion to dismiss, and the Court rescheduled argument. The Court now rules on the motion to dismiss only the law firm as a defendant, the other defendants having not yet responded to the complaint.

Discussion

Plaintiff has confirmed in its papers and at argument that the only ground on which it claims the existence of the fiduciary duty at issue in this motion is Keystone's insolvency. With that point clarified, the law firm argues that the claim is not ripe

because there was no insolvency, both because the unpaid lease obligation was not yet a fixed, established debt and because Keystone still had $46,000 set aside to satisfy further debts. The Court will not resolve the motion on this basis. The existence of set-aside funds relies on defendants' assertions of fact, and even the question of whether the breach of the lease represented a known debt would be difficult to address at this stage. These arguments also awkwardly involve the direct claims against Keystone and Colarusso, which are not yet before the Court. Having agreed to consider the claim against the law firm separately, the Court will focus its ruling on the separate issues particular to the claim against the law firm.

The question with respect to the law firm is simply whether the allegations are sufficient to state a claim. A sufficient pleading requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (internal citations omitted, alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The relevant context includes the nature and elements of the claim at issue. *See Arar v. Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009) ("Plausibility

thus depends on a host of considerations: The full factual picture presented by the complaint, the particular cause of action and its elements, and the available alternative explanations."). "Some claims will demand relatively more factual detail to satisfy this standard, while others require less." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 (3d Cir. 2010). In *Iqbal* and *Twombly*'s own antitrust context, which ultimately entails proving that the defendants not only engaged in parallel conduct but actually agreed to act in concert, the allegations regarding an agreement must be rather strong and actually *show* that element. *See id.* at 319 ("Plaintiffs' obligation to show the existence of a horizontal agreement is not only an ultimate burden of proof but also bears on their pleadings."). Obviously plaintiffs do not have to prove their cases at the pleading stage, but the analysis is certainly directed toward the question of whether they have alleged enough facts to suggest they can find the proof they need in discovery. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011) ("Requiring plausibility to infer an agreement from circumstantial evidence 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" (quoting *Twombly*, 550 U.S . at 556)).

The context of the present case is a claim against a law firm for aiding and abetting a breach of fiduciary duty. This Court has identified "the following three elements of a cause of action for aiding and abetting breach of a fiduciary duty under Pennsylvania law: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach." *Reis v. Barley, Snyder, Senft & Cohen LLC.*,

5

484 F. Supp. 2d 337, 350-51 (E.D. Pa. 2007), *aff'd in part, rev'd in part*, 426 F. App'x 79 (3d Cir. 2011).

Certainly, such a claim may sometimes be valid against a law firm, but the cases Plaintiff cites were based on much stronger factual allegations. In *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406 (3d Cir. 2003), the plaintiff sued lawyers for helping a client, car maker John Z. DeLorean, avoid execution on his property.[1] *Id.* at 408. In a previous suit for unpaid legal bills, the plaintiff had previously obtained a large verdict against DeLorean and an injunction preventing him from transferring assets. *Id.* at 407-08. The defendant law firm had represented DeLorean in that suit and afterward, and allegedly took many actions to help protect DeLorean's assets, including: assisting in formation of another corporation and the transfer to it of DeLorean's interest in a large farm just before the injunction (which the judge in the earlier case found fraudulent and set aside); preparing and recording a deed nearly a year later purporting to confirm the farm conveyance; preparing a memorandum regarding an allegedly fictitious life lease on the farm property dating back almost twenty years; recording the life lease with the county clerk; preparing and recording a subsequent deed once again supposedly transferring the property to the other corporation; writing a letter that deceived the county clerk into believing that an order dissolving the asset transfer injunction had also dissolved the order setting aside the fraudulent transfer; asking the attorney for DeLorean's brother's company not to talk to Morganroth or the Marshal about some furniture DeLorean was hiding from execution in the company's warehouse;

---

[1] The *Morganroth* case does not actually involve a fiduciary breach claim but rather fraud, alleged against the lawyers through aiding and abetting, conspiracy, and direct liability theories. Because Plaintiff has cited the case, and it does involve claims against lawyers for assisting a client's wrongful conduct, it is worth discussing here.

failing to disclose to the court that DeLorean had transferred assets to his brother's company to satisfy a separate judgment against that company; repeatedly moving to vacate writs of execution based on these various transfers, which they knew or should have known were fraudulent; and making similar arguments in a separate bankruptcy proceeding. *Id.* at 408-10.

*Reis*, 484 F. Supp. 2d at 345-46, also contains an impressive litany of allegations. When the Weaver Nut Company, owned by Mr. and Mrs. Weaver, defaulted on loans, the bank appointed a trustee, who in turn hired as a financial consultant another entity with which plaintiffs Reis and Katz were associated. *Id.* at 344. Reis took over multiple officer positions at Weaver Nut, Katz arranged funding and restructuring, and they each acquired 25% ownership, with the Weavers keeping the other half. *Id.* Reis and Katz had great success turning the company around, largely by reversing Mr. Weaver's mistaken business practices. *Id.* at 344-45. Mr. Weaver, unbeknownst to Reis and Katz, began discussions with the defendant law firm and hired the firm ostensibly on both his own behalf and the company's, a conflict in and of itself. *Id.* at 345. Numerous machinations to the company's detriment followed, with the assistance, and sometimes at the direction, of the defendant law firm: when a company called Packaged Foods failed to pay $100,000 owed to Weaver Nut, the law firm advised[2] Packaged Foods that Weaver Nut's UCC-1 form securing the debt was unenforceable; the firm also represented yet another entity, Manna Foods, which bought Packaged Foods' assets, further preventing payment of the debt to Weaver Nut; a firm attorney terminated the development agreement under which Weaver Nut had successfully turned around, fired Reis and other

---

[2] This advice had been revealed to Reis and Katz by the principals of Packaged Foods, so there was a basis for the allegation other than mere information and belief, a basis that did not require overcoming privilege.

managers who were part of the turnaround (precipitating the alteration of financing arrangements predicated on the involvement of Reis and Katz), and threatened Reis and Katz with criminal charges if they returned to Weaver Nut premises; the new management, at the firm's direction, hired new consultants and managers that took orders from the firm, were paid large amounts of money, and ran the company badly; the firm assisted Mr. Weaver in changing bank accounts and addresses on purchase orders so as to divert money from the company; and the firm pursued a lawsuit against Reis and Katz to harass and force them out of the company. *Id.* at 345-46.

Both *Morganroth* and *Reis* feature substantial sets of allegations including numerous direct actions taken by the defendant law firms. The allegations are individually—and certainly collectively—more suggestive of active, wrongful conduct on the part of the defendant firms than anything offered in the present case. Here, the defendant law firm represented only Colarusso and Keystone, which are essentially synonymous. The firm sent two straightforward letters directly to Plaintiff, not anything misleading or involving third parties. Because the essential alleged wrongdoing is the distribution of proceeds to Colarusso himself rather than to Plaintiff (the actual sale of the practice, though it may have resulted in a breach of the lease, was probably inevitable and not a fiduciary duty issue), the only real allegation against the law firm is that it represented Keystone and Colarusso during that process and may have recommended that course of action. There is simply nothing here approaching the multifarious, long-term perpetuation of efforts to protect or contribute to wrongful conduct that was at issue in the cited cases.

Further, the allegations against the law firm do not really include any separate, direct action by the firm outside the normal course of representation. Another case allowing similar claims to go forward specifically relied on allegations of wrongful action beyond ordinary legal representation. *See Amato v. KPMG LLP*, 433 F. Supp. 2d 460, 474 (M.D. Pa. 2006) (finding sufficient statement of a claim where the defendant law firm both directly and indirectly lent its authority and credibility to an illegal tax shelter), *order vacated in part on reconsideration*, No. 06CV39, 2006 WL 2376245 (M.D. Pa. Aug. 14, 2006). Likewise, another claim was dismissed for lacking such allegations: "The Complaint's allegations that Defendant provided legal services that were common in the industry, without more, does not support an inference that Defendant 'knowingly participated' in" the alleged breach of fiduciary duty. *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 519 (D. Del. 2012) (further citing another case, *Morgan v. Cash*, No. CIV.A. 5053-VCS, 2010 WL 2803746, at *6 (Del. Ch. July 16, 2010), that dismissed a similar claim because it failed to plead facts "suggesting how and why" a third-party professional used its position to aid and abet). The actions alleged in this case are the actions of Keystone and Colarusso, with the law firm acting merely in a normal representative capacity.

There are good reasons to require strong, thorough, and specific factual allegations in this sort of case. For one, the context of this case also includes the fact that Keystone and Colarusso would prefer to continue using the defendant law firm as their representation in this matter, rather than be forced to employ separate counsel. If claims of this sort are not held to a high standard, there is a significant danger that plaintiffs will be able to frustrate or complicate defendants' legal representation by including their usual

counsel as co-defendants. Both *Reis* and *Morganroth* were separate suits against the lawyers that did not include their clients as defendants, and the legal disputes between the plaintiffs and the clients appear to have been finished.

Further, the relevant context includes consideration of what will be necessary to prove the elements, and here, where the defendant is a law firm, that raises issues of privilege. The allegations in the *Reis* and *Morganroth* cases were so much more specific and direct—that is, the plaintiffs already knew so much more about the defendant law firms' actions, the potentially wrongful nature of which was inherent or openly observable—that questions of discovery difficulties and privilege were not even raised. Here, the alleged wrongful conduct of the law firm consists entirely of directly advising and representing Keystone and Colarusso, by sending letters and assisting in asset distribution. There is no other aiding and abetting that can be ascertained simply from the law firm's known actions; rather, as discussed at oral argument, there would have to be some inquiry into privileged areas in order to find out what the law firm actually did or advised with regard to the other defendants' alleged fiduciary breach. While some small amount of additional information may be gleaned from unprivileged communications to which third parties were privy as Plaintiff suggested at oral argument, it is highly unlikely that any such information would give sufficient insight into the privileged sphere. Even assuming, *arguendo*, that merely recommending or approving Colarusso's distribution to himself were enough to maintain a claim against the law firm, it may very well be impossible ever to prove the firm made such a recommendation. The privilege issues seriously challenge a conclusion that Plaintiff has set forth enough facts to reasonably expect that discovery will reveal the evidence needed. Given the other dangers of this

type of claim and the weakness of the allegations here, it is inappropriate to allow Plaintiff to conduct a fishing trip looking for evidence that will inevitably be protected by privilege.

For these reasons, the Court will grant the law firm's motion to dismiss. It is apparent that Plaintff has already made what factual allegations it can, so this dismissal will be with prejudice.